UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No.:1:14-cr-29 |
| v. | ) | |
| | ) | Collier/Carter |
| | ) | |
| GERALD DEWAYNE JACKSON | ) | |

## REPORT AND RECOMMENDATION

### I. Introduction

Defendant Gerald Dewayne Jackson's Motion to Suppress (Doc. 31) is before the undersigned Magistrate Judge having been referred by the District Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). Defendant is charged in a three count indictment with a Hobbs Act Robbery; aiding and abetting the use, carrying, brandishing and discharge of a firearm in relation to the crime of a Hobbs Act Robbery; and being a felon in possession of a firearm (Doc. 1). The Defendant seeks suppression of any and all evidence seized by law enforcement after defendant was stopped driving a mid-size silver/grey sedan on August 6, 2013 on suspicion that he was involved in a home invasion and robbery three weeks earlier. This motion concerns a warrantless stop and warrantless searches. As will be discussed in some detail, the undersigned concludes the government has successfully borne its burden to justify the warrantless stop and warrantless searches. Therefore, it is RECOMMENDED that the Defendant's motion to suppress be DENIED.

### II. Relevant Facts

An evidentiary hearing was held before the undersigned Magistrate Judge on Tuesday,

October 14, 2014.  I found the testimony of both government witnesses credible.  A continued hearing was scheduled for December 11, 2014 at the request of Defendant.  On December 9, 2014 counsel for Defendant filed a notice indicating no additional hearing was needed (Doc. 69).  The parties provided additional briefing on the issues in this motion in February 2015.

At the October 14, 2014 evidentiary hearing on this matter, the government offered the testimony of Chattanooga Police Department ("CPD") investigators Michael Early ("Inv. Early") and Kendon Massengale ("Inv. Massengale"). Their combined testimony is summarized as follows: Inv. Early has been a police officer with CPD for approximately twenty-one years. Page ID # 409. Inv. Early was with the burglary and robbery unit for fourteen years, and he has spent the past two years exclusively in the robbery unit. Page ID # 409. Inv. Massengale has been a police officer with CPD for nearly eleven years, the past two and a half of which he has spent in the robbery unit. Page ID # 462. There are a total of seven investigators in the robbery unit. Page ID # 409.

Inv. Early was assigned to investigate a home invasion that occurred on July 17, 2013 at a residence located on Birchwood Drive in Chattanooga. Page ID # 409-411. In that case, sometime shortly after midnight, three black males, all of whom were armed, approached a resident at gunpoint as he was walking from his car to his duplex. Page ID # 410. After one of them pistol whipped the victim, knocking him to the ground, the intruders then took off his pants and shoes, retrieved his keys from his pants pocket, opened the door, and forced him inside. *See* Evid. Hr'g, Gov't Ex. 1. Once inside, the intruders bound the victim's hands and feet with duct tape and demanded that he show them where the drugs and money were. *Id*. The victim repeatedly told the intruders that he worked 12 hours a day for his money and that he was not involved in drug dealing. *Id*. Apparently disbelieving the victim, the intruders continued to

search the home for drugs and cash for over three hours. *Id*. After stealing the victim's flat-screen TVs, a Playstation, and two firearms – a rifle and a 9 mm pistol – the intruders decided to turn to the adjacent townhome. *Id*. Using the victim as a shield, they forced themselves into the adjacent residence. *Id*.; see also Page ID # 410-11. When the home alarm system alerted, however, the intruders fled, leaving the victim in his neighbor's house. Page ID # 411. The victim was treated for lacerations on his head, as well as a broken arm. Page ID # 411.

The day after the robbery, Inv. Early conducted a "neighbor canvass" and spoke face-to-face with a neighbor who wished to remain anonymous due to fear of retaliation. Page ID # 412, 414. The neighbor relayed that on the night of the robbery, she and a friend came home late – sometime after midnight – and they happened to notice a gray or silver four-door car parked on the street in front of the residences. Page ID # 413, 441. She described the car as being "beat up" and "the whole front plastic bumper is missing." Page ID # 413, 441. They drove right by it and they were wondering why it was parked there because they had never seen this particular car so they took note of it. Page ID # 441. Inv. Early explained that from where the victim was first held at gunpoint outside of his front door, he likely wouldn't have been able to see a car parked on the street. Page ID # 439.

Given the seriousness of the offense – a home invasion involving three armed men who beat and bound the victim, holding him hostage for over three hours, and who collectively walked away with additional weapons (a rifle and a 9 mm pistol) – solving this case was a priority for Inv. Early. Page ID # 414. From July 18, 2013, the date he received the tip about the gray or silver four-door car with a missing front bumper, Inv. Early "look[ed] all over Chattanooga for that car." Page ID # 414.

On August 6, 2013, he finally spotted a silver car "missing the whole front bumper"

coming toward him from the opposite direction on Amnicola Highway. Page ID # 414-415. The car was occupied by three black males. Page ID # 415. He initiated a stop of the vehicle in order to investigate whether he could establish a connection between the car and the home invasion. Page ID # 415. While Inv. Early was in an unmarked car, the car was equipped with blue lights and a siren. Page ID # 415. Inv. Early initiated the stop by turning on his blue lights. Page ID # 415. The car, however, did not stop. Page ID # 415. Accordingly, he then activated his siren, yet again to no effect. Page ID # 415. Only after a marked patrol car arrived on scene and blocked its path did the car actually stop. Page ID # 416.

As Inv. Early approached the driver's side door, he made a connection between the car and yet another armed robbery – Inv. Early had just left CPD's Service Center where he had reviewed surveillance video of an attempted robbery of the Kennedy Jewelry Store that had occurred the day before, on August 5, 2013. Page ID # 417-19. During that incident, two black males had entered the store, one of whom carried a rifle. Page ID # 462. The armed individual was noticeably tall, at least 6'4", had a thin build, and had shoulder-length dreads. Page ID # #418, 468. The suspects had also carried a large blue laundry basket into the store with them, inside of which they presumably intended to place the stolen loot. Page ID # 430. 463. Before they were able to take anything from the cases, however, gunshots were exchanged between the armed individual and one of the employees. Page ID # # 462- 463. Surveillance video captured the two suspects as they then fled the store. Page ID ## 462-63. The unarmed individual fled on foot, while the armed individual escaped in a gray four-door car with wheels that appeared to be all black – like there were no hubcaps. Page ID ## 463, 467.

Shortly after the jewelry store robbery, police apprehended Diontre Danforth near the scene and identified him as the unarmed suspect who had attempted to flee on foot. Page ID ##

463-64. That same day, police recovered the rifle believed to have been used in the attempted robbery. Page ID # 465. The rifle was recovered from a street near the scene and in the direction that the armed suspect had traveled. Page ID #465. A citizen had called police to inform them about the rifle, explaining that he had just witnessed an individual throw the gun out of the window of a mid-size gray or silver car. Page ID ## 465-66.

As Inv. Early approached the car on August 6, he realized that this car, too, was a silver four-door car with all-black wheels due to missing hubcaps. Page ID ## 417-18, 422, 424. Inv. Early further knew that the individual at large was a tall black male with long dreads. Page ID #468. And when he peered into the car, he saw the individual sitting in the passenger seat – later identified as the defendant –a tall black male with long dreads. Page ID ## 424, 425. Upon making contact with the occupants of the vehicle, Inv. Early and other patrol officers got the suspects out of the car, patted them down for weapons, and secured them in handcuffs. Page ID # 424, 449. Inv. Early testified at the suppression hearing that, at this point, the defendant was not under arrest. Page ID ## 449-50.

Inv. Early ran a check on the car's registration when he initially pulled the car over. Page ID # 424. The car was registered to a Gerald D. Dozier with an address of 420 S. Seminole Drive. Page ID # 424; Gov't Ex. 1, CAD Report. Inv. Early asked the occupants if any of them owned the car, to which the defendant replied that it belonged to his grandmother, a Ms. Dozier. Page ID # 424. At the suppression hearing, Inv. Early testified that Gerald D. Dozier was deceased, but it is not clear if Inv. Early learned this fact at the scene from the defendant or learned this later from Ms. Dozier. Page ID # 424.

After securing the cars' occupants (one of whom had an outstanding warrant), Inv. Early called Inv. Massengale, the lead investigator assigned to the Kennedy Jewelry Store robbery.

Page ID ## 425-26; *see also* Gov't Ex. 1 at 3 (showing the information provided on occupant Gregory Hyter, including that he had an outstanding warrant for his arrest in Catoosa County). Inv. Massengale recalled that Inv. Early believed he had stopped the at-large shooter in the attempted robbery from the day earlier, based on the car's resemblance to the getaway car, and one of the occupants' resemblance to the shooter – specifically, that the occupant, like the shooter, was a tall black male with a thin build with shoulder-length dreads. Page ID # 468. Inv. Massengale asked Inv. Early if he could see anything of significance in the car. Page ID # 426. Inv. Early relayed that he could see some items of clothing in the backseat, as well as a pair of white shoes. Page ID #426. These items were visible in plain sight. Page ID # 451. Inv. Massengale asked whether the shoes appeared to be big or small, to which Inv. Early replied that they appeared to be big. Page ID # 426. This was of interest to Inv. Massengale, as he had noticed on the video from the jewelry store robbery that the shooter had large white Nike shoes. Page ID # 468.

Inv. Massengale, who was not working at the time that Inv. Early called him, relayed that he wanted to speak with the occupants, particularly the defendant, in light of his physical resemblance to the shooter. Page ID ## 426, 467-69. Inv. Massengale then headed straight to CPD's Service Center, where the parties were transported in hopes that they would agree to be interviewed. Page ID ## 426, 467-69, 484. At the suppression hearing, Inv. Massengale testified further about why he decided to have the defendant transported to the police station:

> Well, at that time, I mean, there was, I felt that there was enough to hold him while we further looked into the matter. I mean, such a dynamic crime, I felt that he was more than likely the one involved in it, and so, there was a few things we had to tie up before he was released or arrested, physically arrested.

Page ID #486.

Inv. Massengale likely arrived at the police station within thirty minutes of being advised

of the stop. Page ID # 484. In the meantime, Inv. Early had the car towed to CPD's Service

Center "because it was a suspect vehicle in a robbery." Page ID ## 426, 452. Some of the patrol

officers who had shown up to the scene as backup handled the tow delivery, including

conducting an "inventory" search prior to the tow. Page ID # 452.[1] During this search, the

officers recovered a pistol from the car. Page ID # #452, 482-83.[2]

 Once the occupants were transferred to the Service Center, Inv. Early attempted to speak

with them. Page ID ## 426-27. Defendant was handcuffed or chained to a bench in the squad

room. Page ID # 485. Inv. Massengale testified he was not free to leave but he was not yet

under arrest. Page ID # 485. While the defendant signed a Miranda waiver, signifying his

agreement to speak with law enforcement, he ultimately relayed that he did not have anything to

share. Page ID ## 427-28. Defendant's cell phone was removed from defendant's pocket by an

officer (who was not identified at the suppression hearing) and placed on Inv. Massengale's

desk. After thus hitting a dead-end as far as interviewing the occupants, Inv. Massengale began

pulling the defendant's criminal history and trying to find out who his associates were. Page ID #

469. The investigators then decided go to Ms. Dozier's residence, the residence on the silver

sedan's registration, to find out if she could provide them with any further information linking

the defendant to the Kennedy Jewelry attempted robbery. Page ID # 428. Specifically, they

wanted to find out from her who may have driven the car the day before. Page ID ## 486, 490.

 When they arrived at her home, Ms. Dozier was very cooperative. Page ID # 470. She

advised that the defendant stayed with her and she provided written consent to search her house,

as well as her car. Page ID # 470, 473-74; *see also* Evid. Hr'g Gov't Ex 5. In the garage, the

---

[1] The government did not present any evidence regarding a policy on the part of the CPD to conduct inventory searches of seized or impounded vehicles.
[2] The government states that this pistol will not be presented as evidence in this case.

investigators located a Saiga .223 magazine – the same caliber and brand as the rifle recovered from the robbery. Page ID # 474. Inv. Massengale testified that he had not come across a Saiga firearm during his entire career until this incident.  Page ID # 474.

Ms. Dozier further added that the defendant had spent the day before (i.e., the day of the attempted robbery) with his friend "Chicago." Page ID # 429. Diontre Danforth, the unarmed co-defendant police had apprehended the day before, has the street name of "Chicago."  Page ID #429. When asked whether she had a laundry basket, Ms. Dozier replied that she did, but added that she had noticed it missing the day before, explaining that she had come home to find her clothing dumped on the floor and the basket gone. Page ID # 430. When shown a picture of the basket recovered from the robbery, Ms. Dozier identified it as being hers. Page ID #430.

While the investigators were with Ms. Dozier at her home, there was some discussion related to her home telephone. Page ID ## 430, 431. That conversation triggered Ms. Dozier to ask the investigators whether they had her cellphone; she said it was a black Pantech smart phone. Page ID ## 431, 455, 471-472, 479, 494. This exchange was captured on a recording. Page ID # 472; *see also* Evid. Hr'g, Gov't Ex. 10 (played in open court). Ms. Dozier further provided her written consent to search the phone. Page ID # 471.

Once back at the Service Center, Inv. Massengale confirmed that Ms. Dozier's description was sufficient to search the phone the defendant had on him at the time of his arrest – a black Pantech phone. Page ID ## 472, 494. The officers had not sought the defendant's permission to search the phone prior to searching it. Page ID ## 431, 472. Nor had they searched the phone prior to Ms. Dozier providing her written consent. Page ID ## 431, 472.

Inv. Massengale then searched the contents of the phone and found another piece of incriminating evidence against the defendant – a photograph of him holding a black assault rifle

which resembled the very assault rifle used in the robbery and recovered from the street a few blocks away from the incident. Page ID ## 472-73; see also Evid. Hr'g, Gov't Ex. 7.  Back at the station, with Ms. Dozier's signed consent form in hand, Inv. Massengale searched the car. Page ID # 475. At that point, Inv. Massengale removed the shoes from the car and photographed them. Page ID ## 475-78.

Due to the car's resemblance to the suspect's vehicle and the defendant's resemblance to the shooter; the discovery of the large sized white shoes in the car; Ms. Dozier's statement that the defendant had spent the day before with "Chicago," the street name of the second suspect who was apprehended near the scene, and that the two had borrowed her car; her identification of the recovered laundry basket as being hers; the discovery of the Saiga magazine; and the cellphone picture showing the defendant holding a rifle resembling the same recovered rifle, the defendant was placed under arrest. Page ID ## 478-79. Inv. Massengale testified at the suppression hearing that the defendant was placed under arrest "sometime that evening." Page ID # 478.  Inv. Massengale also stated defendant was arrested "mid-evening of that day that he was stopped." Page ID # 478.

During the evidentiary hearing, defense asked counsel what time the stop had occurred, but Inv. Early could not remember. Page ID #  447. Likewise, Inv. Massengale could not recall exactly when Inv. Early had called him to inform him of the stop, but he thought it may have been mid-morning. Page ID ## 480, 483. Based on the CAD report, it appears that Inv. Early initiated the stop at 1:07 p.m. See Gov't Ex. 1 at 1 (showing dispatch time of 1:07:09 p.m.). The report further shows that within one minute of alerting dispatch that he was initiating a traffic stop, Inv. Early ran a search of the car's registration information based off of the license plate. *See id.* at 2-3 (showing registration information at 1:08 p.m. and 13:07:10 (or, 1:07:10 p.m.)).

Ms. Dozier's consent forms for her house and car were executed at about 4:15 p.m. and for her cellphone at 4:30 p.m. *See* Evid. Hr'g, Gov't Exs. 5-6; Page ID # 488. The CAD report shows that someone was transported to the Hamilton County Jail at 6:34 p.m. and another person at 6:42 pm. Gov't Ex. 1 at 1.    The undersigned concludes the defendant was transported at one of those times.

III. Analysis

A.    Burdens of Proof

Following the evidentiary hearing on the motion to suppress, the undersigned asked for additional briefing because I concluded the issues raised by defendant's motion had not been adequately briefed and a new issue had arisen during the course of the evidentiary hearing. Before discussing the merits of defendant's motion to suppress, it is necessary to focus on the burdens of proof raised by a motion to suppress a warrantless search and seizure.

Once a defendant shows a search and seizure was warrantless, the search and seizure are *per se* illegal, and the burden is on the government to show that one or more of the exceptions to the Fourth Amendment's warrant requirement apply.  As explained by the Supreme Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971),

> the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.  The burden is on those seeking the exemption to show the need for it.

(Internal citations omitted).  This rule has been stated more recently as follows:

> "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Feldman*, 606 F.2d 673, n. 11 (6th Cir.1979). "[S]earches and seizures conducted outside the judicial

10

process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334, (1993). *Therefore, a defendant's showing that a warrantless search has occurred generally constitutes a prima facie showing of illegality, and the Government has the burden of showing that an exception applies. United States v. Herndon*, 501 F.3d 683, 692 (6th Cir.2007). The Government must show by a preponderance of the evidence that the search and seizure was reasonable. *United States v. Matlock*, 415 U.S. 164, n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

*United States v. Square*, 790 F. Supp.2d 626, 643 (N.D. Ohio 2011) (emphasis added). *See also United States v. Herndon,* 501 F.3d 683, 692 (6th Cir.2007) ("[t]he government has the burden of proving the legality of a warrantless search"); *United States v. Oliver*, 686 F.2d 356, 371 (6th Cir.1982) ("[t]he burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment"); *United States v. Nance,* 2010 WL 4004782 *16 (E.D. Tenn. Sept. 17, 2010) ("[w]hen a warrantless search has occurred, the Government bears the burden of proving by a preponderance of the evidence that it was justified under one of the recognized exceptions to the warrant requirement"); *McShepard v. Shewalter,* 2010 WL 5887798 *19 n. 7 (N.D. Ohio Dec. 23, 2010) (unpublished) ("a defendant's showing that a warrantless search has occurred generally constitutes a prima facie showing of illegality, and the Government has the burden of showing that an exception applies."). The reason for the government's burden in the event of a warrantless search and seizure is discussed in one treatise as follows:

> With respect to the issue which is usually central in a motion to suppress hearing—the reasonableness of the challenged search or seizure—most states follow the rule which is utilized in the federal courts: if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution. The warrant-no warrant dichotomy is typically explained on the ground that when the police have acted with a warrant "an independent determination on the issue of probable cause has already been made by a magistrate, thereby giving rise to a presumption of legality," while when they have acted without a warrant *the evidence comprising*

11

> *probable cause is particularly within the knowledge and control of the arresting agencies."*

Wayne LaFave, Search and Seizure, § 11.2(b) (4th ed.2004) (emphasis added).

The above authorities demonstrate it is not the defendant's burden in his motion to suppress to anticipate and discuss why every possible exception which might have been available to police does not apply to justify a warrantless seizure. It is the government's burden to justify a warrantless seizure -- an appropriate burden since it is the government that represents the police who made the search and seizure, and the defendant cannot read the minds of the police. Thus, in this instance, the undersigned concluded it was appropriate to have the government brief in its entirety the alleged constitutional basis for seizure of the tennis shoes, not just the validity of the vehicle stop, though the defendant had focused in his initial motion to suppress on the constitutional basis for stopping the car. As will be discussed, even if the car was stopped legally on the basis of reasonable suspicion, that alone will not justify the warrantless seizure of the shoes. Simply put, it is not the defendant's burden to guess and then discredit the warrant exception(s) police might have relied upon to seize the shoes without a warrant after the car was stopped. [3]

The defendant's motion to suppress alleged the seizure of the tennis shoes was warrantless. This allegation was not contested by the government in its response brief and the evidence established it was a warrantless seizure at the suppression hearing. Thus, there was a prima facie showing that the seizure of the shoes was illegal. Had the defendant *affirmatively* conceded in his motion or at the suppression hearing that the *only* issue he was raising relating to

---

[3] Possible exceptions might have included: (1) search of the car following a legal impoundment of the vehicle, (2) search of the vehicle pursuant to valid consent, (3) search pursuant to probable cause to believe the car contained evidence of a crime, or (4) application of the plain view doctrine. It is not the defendant's burden to anticipate these exceptions and discredit each of them in his motion to suppress.

the warrantless seizure of the sneakers was the stop of his car, then I would have determined the

government had met its burden in relation to this warrantless seizure. But, in this case, no such

affirmation had been made. The defendant challenged the seizure as a warrantless seizure, and

the government bears the burden to show the shoes were properly seized pursuant to a valid

exception to the Fourth Amendment's search warrant requirement. To this end, given the

confusion of what issues were in play, the undersigned asked the parties to further brief the

issues. The undersigned will now address the merits of the defendant's motion to suppress.

B. The Traffic Stop

The Fourth Amendment provides that "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated." U.S. Const. amend. IV. The Fourth Amendment's protection against unreasonable

seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of arrest."

*United States v. Arvizu*, 534 U.S. 266, 272-73 (2002). Whereas an arrest requires probable cause,

an investigatory, or so-called "*Terry* stop," only requires reasonable suspicion to believe that the

"individual is, was, or is about to be engaged in criminal activity." *United States v. Hurst*, 228

F.3d 751, 757 (6th Cir. 2000) (internal quotations omitted).

To determine whether there was reasonable suspicion to justify a *Terry* stop, the Court

"must consider the totality of the circumstances—the whole picture." *Id.* at 8 (internal

quotations omitted). And it must do so from the "standpoint of an objectively reasonable police

officer." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). While an officer's reliance on "a

mere hunch is insufficient to justify" a *Terry* stop, for reasonable suspicion to exist "the

likelihood of criminal activity need not rise to the level required for probable cause, and it falls

considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at

274; *see also Alabama v. White*, 496 U.S. 329, 330 (1990) (recognizing that "[r]easonable suspicion is a less demanding standard than probable cause"). Put another way, reasonable suspicion only requires "some minimal level of objective justification" and is satisfied if the officers "articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotations omitted).

In *United States v. Cortez*, 449 U.S. 411, 417–18 (1981), the Supreme Court interpreted the requirement that descriptive characteristics be "particularized" as meaning that the characteristics are specific and, when viewed in their entirety, will "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez*, 449 U.S. at 418–419. However, "[i]t is not necessary for the characteristics to be uncommon or especially unique in order to be particularized." *United States v. McCauley*, 548 F.3d 440, 444 (6th Cir. 2008) (citing *United States v. Molina*, 226 Fed. Appx. 523 (2007)). In *McCauley*, for example, the Sixth Circuit found that a description of "an armed black male driving a small black SUV" was sufficiently particularized and held that the officer's stop of a car matching that description in an area close to the car's last known location was supported by reasonable suspicion. *Id.* at 444-46.

Here, Inv. Early recognized the car the defendant was driving as matching the description of the car used in the home invasion robbery. It was a fairly unique description because the four door grey or silver sedan had the "whole front bumper missing," an uncommon characteristic for a vehicle. Defendant argues that because the description of the vehicle used in the home invasion was given by an unidentified informant, the neighbor, then this information was insufficient to support reasonable suspicion. Defendant cites *Florida v. J.L.*, 529 U.S. 266 (2000) in support of this argument. In *J.L.*, an anonymous person called the police and reported that a young black male standing at a particular bus stop wearing a plaid shirt was carrying a

14

gun. Police went to the bus stop, saw a man meeting that description, and frisked him seizing a gun from his pocket. The Court found the tip insufficient to support reasonable suspicion stating, "[i]n the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 270 (internal citations omitted). Given the anonymity of the tip, the Court found it significant that there was no corroborating information obtained by police before the frisk was conducted. *Id.*

In the instant case, the tip provided to Inv. Early was not anonymous to Early. Early canvassed the neighborhood and spoke face to face with the informant. The only reason her name was not taken was to protect her from retaliation, a reasonable precaution given the nature of the crime being investigated. Furthermore, unlike the police in *J.L.*, Early approached the witness, not the other way around, and he was able to assess her credibility from his personal conversation with her. Further, he knows where she lives and could follow-up if necessary. All these factors provide an indicia of reliability that was not present with the purely anonymous tipster in *J.L.*

Defendant also contends that the witness in this case could not have seen the vehicle at issue because it was too dark. However, she told Inv. Early that she drove right past the vehicle and made special note of it as it was not familiar to her and she wondered why it was parked there. I conclude the information provided by the unidentified witness was sufficiently reliable and particularized to justify a stop for purely investigative purposes. *See e.g., Molina*, 226 Fed. Appx. at 527-28 (finding a description of the suspect's vehicle as a "small black Nissan"

sufficiently particular and that reasonable suspicion existed where, a minute after dispatch relayed that suspect in a drive-by shooting would be driving a "small, black Nissan," police stopped a car matching that description near the reported scene); *United States v. Long*, 464 F.3d 569 (6th Cir. 2006) (holding unidentified citizen's report that three men in a black and gray Ford Ranger pickup truck were robbing his neighbor's house supported stop of a Ford Ranger matching the description driving away from the area where the call had originated); *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (concluding that a victim's description of assailant's "dark-colored Thunderbird," given within 25 minutes of the assault, with a damaged grill and that there would be three people in the car provided reasonable suspicion to justify the stop of a dark blue Mercury Cougar with a damaged grill with two occupants instead of the reported three, explaining that, despite the differences between the reported description and the facts the police observed, the car nonetheless "roughly" matched the description of the suspect's car and it was observed in a location consistent with the distance the assailant could have traveled in the amount of time since the incident occurred).[4]

On August 6, 2013, once Inv. Early stopped the car he noticed the wheels were missing hubcaps giving them a "blacked out" appearance and that these wheels, along with the fact that the vehicle was a four door grey or silver sedan, matched the description of the car used in the jewelry store robbery. Furthermore, within seconds, Inv. Early noticed that the passenger matched the specific description of one of the defendant's in the jewelry store robbery; *i.e.* a tall,

---

[4] I also note that in *J.L.*, the Court indicated that "extraordinary dangers sometimes justify unusual precautions." *J.L.*, 529 U.S. at 272. The suggestion was that the more extreme the danger, the less information required to make an investigative stop. While the undersigned finds there was sufficient information to make a *Terry* stop without making such an analysis, I observe the crime being investigated was particularly violent and had a predilection for repetition. There was a very significant concern that the general public continued to be in danger with the suspects at large.

thin black man with shoulder length dreads. As the stop continued, further incriminating information was gathered. Specifically, Inv. Massengale asked Inv. Early if he could see anything in the car. Looking through the car window from the outside, Inv. Early saw in plain sight a pair of white shoes. While the testimony from the suppression hearing does not specifically state that Massengale explained the significance of the shoes to Early, it is clear from the testimony that Early and Massengale were discussing the color and size of the shoes in the back seat in relation to the jewelry store robbery. I therefore conclude that Early and Massengale discussed the shoes as belonging to the jewelry store robbery suspect. At this point, Early and Massengale made the decision to transport the defendant to the police station and seize the vehicle.[5]

    C.    <u>Seizure of the Vehicle and the Defendant's Cell Phone</u>

The evidence indicates that once the defendant was transported to the police station while Invs. Early and Massengale continued the investigation, he was searched and the black Pantech cell phone in question was seized. Inv. Massengale indicated that defendant was taken to the police station to be interviewed and to be held while they conducted further investigation.[6]

_____

[5] The government has stated in its brief that the vehicle was "towed to preserve evidence" and patrol officers conducted an "inventory search" though the clothes and shoes were not removed from the vehicle. A firearm, which is not sought to be introduced into evidence, was found. However, no evidence was adduced at the suppression hearing that the CPD had an impoundment and inventory policy. Absent evidence of such a policy, the government cannot rely upon impoundment and an inventory search as a reasonable search pursuant to the Fourth Amendment. Inventory procedures are intended to serve three purposes: (1) protect the owner's property while it is in police custody, (2) insure against claims of lost, stolen or vandalized property, and (3) guard the police from danger. *Florida v. Wells*, 495 U.S. 1, 4 (1990); *Colorado v. Bertine,* 479 U. S. 367, 372 (1987). An inventory search which complies with Fourth Amendment standards must be conducted by the police according to routine, standard procedures after the vehicle is seized or impounded. *Id.*

[6] The government does not attempt to explain how the defendant was lawfully searched and the cellphone seized from his person at the police station if the defendant was being held pursuant to an investigatory stop.

While Inv. Massengale did not use the words "probable cause," his description of the weight of evidence which he believed he had at that time regarding defendant indicates his awareness of a sufficient weight of evidence to support probable cause. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "The Fourth Amendment standard for probable cause requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Goodwin v. City of Painesville*, 781 F.3d 318, 33 (6th Cir. 2015) (quoting *DeFillippo*, 443 U.S. at 37).

At the time defendant was taken to the police station, police knew defendant was riding in a vehicle he said belonged to his grandmother which matched a particularized description of the get-away-car in the jewelry store robbery-- a silver/grey four door sedan with no hubcaps giving a blacked out appearance to the wheels. Furthermore, the defendant met a specific description of the shooter in the robbery: tall, thin, same race, and shoulder length dreads. While the physical description of the defendant or the physical description of the car alone would not be enough to support probable cause, these two specific descriptions, when coupled together, is enough to support a fair probability that the defendant was involved in the jewelry store robbery. Certainly, police did not have enough evidence *to convict* the defendant of the robbery at that time, but they had enough to arrest him – which they did when they took him to the police station. While police may not have called it an arrest, it was a de facto arrest. Involuntary removal to a police station for interrogation purposes is the traditional "line" wherein a *Terry* stop becomes a *de facto* arrest:

> "There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. *Dunaway,* [442 U.S.] at 212 [2256]; *Florida v. Royer*, 460 U.S. 491, 499 [103 S.Ct. 1319, 1325, 75 L.Ed.2d 229] (1983) (plurality opinion). And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause."

*United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994) (internal brackets original) (footnote omitted) (quoting *Hayes v. Florida,* 470 U.S. 811, 815-16, (1985)).

Once the defendant was lawfully arrested, police could conduct a search incident to arrest of his person and the passenger area of the vehicle in which the defendant had been riding. *Chimel v. California* , 395 U.S. 752, 762-63 (1969) (A search incident to arrest is a valid exception to the warrant requirement); *see also* , *United States v. Myers* , 102 F.3d 227, 232 (6 th Cir. 1996) (same). This rule has been extended to a search, without a warrant or probable cause, of the interior of an automobile incident to the lawful custodial arrest of the occupant of the vehicle. *United States v. Mans* , 999 F.2d 966, 968 (6th Cir. 1993) (citing *New York v. Belton*, 453 U.S. 454, 460 (1981)). Such a search can be made even if the arrestee has become separated from the vehicle. *Mans*, 999 F.2d at 968-69 (citing *United States v. White*, 871 F.2d 41, 44 (6th Cir.1989)); *see also United States v. Chaar*, 137 F.3d 359, 363 n. 6 (1998); *United States v. Hudgins*, 52 F.3d 115, 119 (6th Cir. 1995). Moreover, for the same reasons that police had probable cause to believe that defendant was involved in the jewelry store robbery, police also had probable cause to believe the vehicle itself was involved in the jewelry store robbery and contained evidence of the robbery (the white shoes) and could therefore lawfully seize the vehicle as the getaway car and search it -- which they did. "Police may search a vehicle without

a warrant if they have probable cause to believe it contains contraband. … Moreover, even if the police lack probable cause to believe a car contains contraband, they may seize the car if they have probable cause to believe the car itself is contraband.*" United States v. Musick*, 291 Fed. Appx. 706, 722 (6th Cir. 2008) (*citing Florida v. White*, 526 U.S. 559, 564- 66 (1999)).

     B.   <u>Valid Consent To Search The Cellphone Was Obtained.</u>

  "While the Fourth Amendment protects citizens from unreasonable searches and seizures, a search is not unreasonable if an individual with a privacy interest in the item to be searched gives voluntary consent." *McCauley*, 548 F.3d at 446 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

    In his Motion to Suppress, the defendant does not claim that Ms. Dozier is not the actual owner of the phone.  Rather, he claims that it was unreasonable for the officers to believe that she was the owner when the phone had been found in the defendant's possession and because a cursory review of the contents would not have revealed any information indicating that the phone belonged to Ms. Dozier. However, as the evidence established, there was no search of the phone prior to obtaining consent from the owner, Ms. Dozier.   Essentially, defendant appears to argue that because he was the "apparent" owner of the phone, it was unreasonable for the police to rely on the actual owner's consent and, therefore, it should not be considered valid.  The defendant's argument, however, is contrary to established law.  *See Illinois v. Rodriguez,* 497 U.S. 177, 188- 89 (1990) (explaining that if a man of reasonable caution would not be warranted in believing that a consenting party had authority over the property, "then warrantless entry without further inquiry is unlawful unless **authority actually exists**.") (emphasis added).   Regardless of whether the defendant could have provided his consent to a search as one "apparently authorized" to consent to a search, the police in this instance obtained consent from the actual

owner.

Defendant appears to contend that he at least had common authority over the cell phone because he was using it, it was in his possession. Although that is true, I conclude Ms. Dozier's consent which was clearly voluntary, gave officers all the authority to search they needed. Valid consent to search a premises is recognized as an exception to the Fourth Amendment's requirement of a search warrant. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). The government bears the burden of demonstrating that consent was "freely and voluntarily given," without influence of duress, coercion, or mere submission to authority. *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968), *United States v. Van Shutters,* 163 F.3d 331, 335 (6th Cir.1998). That burden must be met with "clear and positive testimony." *United States v. Hurst,* 228 F.3d 751, 757 (6th Cir. 2000); *Van Shutters*, 163 F.3d at 336. The government need not prove that it was the defendant himself who gave consent to search. "A search does not violate the Fourth Amendment where police obtain consent to search from one who possesses common authority over the premises." *United States v. Clutter,* 914 F.2d 775, 777 (6th Cir.1990); *see also United States v. Matlock,* 415 U.S. 164, 171 (1974) (holding that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.") The Court in *Matlock* explained that common authority does not merely relate to the property interest a third-party may have in the property, and stated that "[t]he authority which justifies the third-party consent does not rest upon the law of property. *United States v. Matlock,* 415 U.S. 164, 171 (1974). Further, the Court explained that common authority rests "on mutual use of the property by persons generally having joint access or control

21

for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.; see also United States v. Burns*, 298 F.3d 523, 542 (6th Cir. 2002) ("The concept of 'common authority or control' enables a cooccupant such as Burns to consent to a search if that party has the right to use or possess the property.")

The Defendant would have to argue that Ms. Dozier lacked common authority to consent to the search of the cell phone. According to defendant, Ms. Dozier could not give valid consent on his behalf to search his phone because "Jackson had the cell phone in his possession and they should have asked him for consent. In this case no such request was made, but neither was there any search of the phone on the scene of the investigatory detention.

It is well settled that a person with common authority over the premises to be searched may give valid consent to search the premises. *United States v. Matlock,* 415 U.S. 164, 170 (1974) ("the consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared…..") In *Matlock*, police asked the girlfriend of the defendant for permission to search her and the defendant's bedroom. This conversation took place at the front door of the house while the defendant was detained in a squad car parked nearby. The *Matlock* Court concluded the girlfriend, as co-occupant of the bedroom, had common authority to give valid consent and that the consent of the defendant, who had been absent from the discussion between police and his girlfriend, was not necessary for police to legally search the bedroom. *Id.* at 170 and 177.

On the other hand, it is also well settled that if a co-occupant of the premises to be searched is present at the time consent is given by the other co-occupant and if he or she

expressly refuses consent, then the consent to search is not valid for Fourth Amendment purposes. *Georgia v. Randolph,* 547 U.S. 103, 105 (2006) *(*wife's consent to search residence was deemed invalid as to her husband where husband was present during the conversation about consent and he expressly refused consent.) As stated by the *Randolph* Court, "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out."), *accord United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007)*; United States v. Penney*, 576 F.3d 297, 309 (6th Cir. 2009). Stated another way, police do not have an affirmative duty to seek out a nearby co-occupant to ask for consent when another co-occupant with common authority has already given it. Police may not, however, remove a co-occupant from the premises to be searched specifically for the purpose of avoiding an objection to the consent to search. *Randolph*, 547 U.S. at 121 ("So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand….") Accordingly, I conclude for the above reasons there is no Fourth Amendment violation and the defendant's Motion to Suppress must be denied on this ground as well.

## IV. Conclusion

Accordingly, for the reasons stated herein, I RECOMMEND that the Defendant's motion to suppress be DENIED. [7]


S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Courts order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).